BRYAN SCHRODER
United States Attorney

RICHARD L. POMEROY
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: richard.pomeroy@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, | ) Case No. |
|---|---|
| Plaintiff, | ) |
| vs. | ) **COMPLAINT** |
| ROYAL T. HILL, SR., dba ROYAL CHARTERS AND TOURS, | ) |
| Defendant. | ) |

COMES NOW the United States of America, through the United States Attorney for the District of Alaska, and alleges as follows:

1. Defendant resides within the territorial jurisdiction of this

Court. Jurisdiction is conferred upon the Court under 28 U.S.C. § 1345. Plaintiff brings this suit pursuant to the provisions of 31 U.S.C. § 3711 et seq.

2. On July 20, 2010, the Defendant executed a promissory note to secure a loan from Alaska Pacific Bank in the amount of $120,000.00 at 7% annual interest (the Loan). See Exhibit 1, Promissory Note. A Commercial Security Agreement, also executed on July 20, 2010, was part of the loan, identifying certain items of personal property as collateral. See Exhibit 2, Commercial Security Agreement.

3. Subsequent to issuance of the Loan, Northrim Bank assumed ownership of the Loan from Alaska Pacific Bank.

4. On or about July 15, 2017, the Defendant defaulted upon the Loan's repayment obligations to Alaska Pacific Bank / Northrim Bank.

5. On January 31, 2019, Alaska Pacific Bank / Northrim Bank executed an Assignment of Loan Documents and Related Rights assigning the Loan to the Department of Interior pursuant to the terms of Department Loan Guarantee Certificate Number G103D1E0504. The Department of the Interior paid Alaska Pacific Bank / Northrim Bank's claim for loss and assumed ownership of the debt under the

Department of Interior's Loan Guarantee, Insurance and Interest Subsidy Program, 25 U.S.C. §§ 1481 et seq., 1511 et seq., and 25 CFR Part 103. See Exhibit 3, Assignment of Loan Documents and Related Rights.

6. On April 17, 2019, the Department of Interior demanded payment of the unpaid Loan balance in the amount of $75,513.28. See Exhibit 4, Letter of Demand.

7. As of July 22, 2019, $76,778.02 was due on this obligation, including a principal balance of $68,694.71, and interest in the amount of $8,083.31 accrued through July 22, 2019 at the annual rate of 7% (and accruing each day thereafter at the per diem rate of $13.17). See Exhibit 5, Certificate of Indebtedness.

WHEREFORE, Plaintiff prays:

1. For judgment against the Defendant in the principal amount of $68,694.71, and interest in the amount of $8,083.31 accrued through July 22, 2019 at the annual rate of 7%, and additional interest in the amount of $13.17 per day after July 22, 2019, calculated through the present date.

2. For post judgment interest at the rate provided by 28 U.S.C. §

1961, until the obligation is fully satisfied.

    3. For costs and disbursements incurred in this action.

    4. For such other further relieve that the Court may deem just and equitable.

    DATED this 28th day of October, 2019, in Anchorage, Alaska.

                                    BRYAN SCHRODER
                                    United States Attorney

                                    s/ Richard L. Pomeroy
                                    RICHARD L. POMEROY
                                    Assistant U.S. Attorney
                                    United States of America

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $120,000.00 | 07-20-2010 | 10-15-2025 | 3061 | | | JB | TV |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Royal T. Hill, Sr. DBA: Royal Charters & Tours
PO Box 67
Hoonah, AK 99829

**Lender:** Alaska Pacific Bank
Nugget Mall Office
2094 Jordan Ave.
Juneau, AK 99801
(907) 789-4844

**Principal Amount: $120,000.00** **Date of Note: July 20, 2010**

**PROMISE TO PAY.** Royal T. Hill, Sr. ("Borrower") promises to pay to Alaska Pacific Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Hundred Twenty Thousand & 00/100 Dollars ($120,000.00), together with interest on the unpaid principal balance from July 20, 2010, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 3 monthly consecutive principal payments of $1,600.00 each, beginning August 1, 2010, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 182 monthly consecutive interest payments, beginning August 1, 2010, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2011, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2012, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2013, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2014, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2015, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2016, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2017, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2018, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2019, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2020, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2021, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2022, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2023, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 5 monthly consecutive principal payments of $1,600.00 each, beginning June 15, 2024, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; 4 monthly consecutive principal payments of $800.00 each, beginning June 15, 2025, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum; and one principal and interest payment of $2.15 on October 15, 2025, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as Published in the Wall Street Journal (currently 3.250%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Notwithstanding the foregoing, the rate

of interest accrual described for any principal only payment stream applies only to the extent that no other interest rate for any other payment stream applies. Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs; then to any late charges; then to any accrued unpaid interest; and then to principal. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Prime Rate as Published in the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Three Years. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.250% per annum.** The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be less than 7.000% per annum or more than the lesser of 10.000% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Alaska Pacific Bank, 2094 Jordan Ave. Juneau, AK 99801.

**LATE CHARGE.** If a payment is 30 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note, with the final interest rate described in this Note applying after maturity, or after maturity would have occurred had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of any Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount. Borrower is personally obligated and fully liable for the amount due under this Note. Lender, at Lender's sole option, has the right to sue on this Note and obtain a personal judgment against Borrower for satisfaction of the amount due under the Note either before or after the exercise by Lender of any other right or remedy it may have to proceed against any of the collateral securing this Note.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Alaska without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Alaska.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Alaska state courts in the Judicial District at or nearest Lender's address shown herein, or at Lender's option, to the jurisdiction of the courts wherever any Property is located.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**DISCLOSURE OF RECORDS.** Borrower hereby consents to the disclosure by Lender of any information or records in Lender's possession relating to Borrower, this Note and any collateral, as may be required of Lender by court order, administrative order, subpoena, subpoena duces tecum, or other similar process, or as may be necessary in connection with any sale or assignment of or grant of a participation in Lender's interest in any loan, or as permitted by applicable law.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Alaska Pacific Bank, Nugget Mall Office, 2094 Jordan Ave., Juneau, AK 99801.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

x _____
Royal T. Hill, Sr.

Certified to be True and Correct Copy of Original

_____
Cynthia El-Khoury-VP Loan Documentation Manager

Assigned to BIA without recourse

LASER PRO Lending, Ver. 6.52.10.001 Copr. Harland Financial Solutions, Inc. 1997, 2010. All Rights Reserved. - AK F:\APPS\CFI\LPL\D20.FC TR-9497 PR-57

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $120,000.00 | 07-20-2010 | 10-15-2025 | 3061 | | | JB | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Royal T. Hill, Sr. DBA: Royal Charters & Tours
PO Box 67
Hoonah, AK 99829

**Lender:** Alaska Pacific Bank
Nugget Mall Office
2094 Jordan Ave.
Juneau, AK 99801
(907) 789-4844

THIS COMMERCIAL SECURITY AGREEMENT dated July 20, 2010, is made and executed between Royal T. Hill, Sr. ("Grantor") and Alaska Pacific Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

PMM on 1978 (rebuilt in 1994) 37.3' Tollycraft Corporation Flybridge Motoryacht "CATHY J", HIN: TLY370780178, O/N: 683895; (2) 1994 Perkins Main Engines, Model: Range 4165T, S/N Port: U8005559, S/N Starboard: 4834075; including but not limited to all electronics and equipment;

AND

PMM on 1980 35.3' Tollycraft Corporation Tollycraft "37 S" Flybridge Motoryacht "E-Z RIDER", HIN: TLY371200180, O/N: 626766; (2) Caterpillar Main Engines, Model: 3208NA, S/N Port: 75V5269, S/N Starboard: 75V5001; including but not limited to all electronics and equipment;

SEE ATTACHED "EXHIBIT A"

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the authorized signer(s); (4) change in Grantor's principal office address; (5) change in Grantor's principal residence; (6) conversion of Grantor to a new or different type of business entity; or (7) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or principal residence will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Community Property Election.** Grantor has not and will not enter into a community property agreement or community property trust without Lender's prior written consent.

**Transfers in Trust.** Grantor has not and will not transfer any of Grantor's assets into a trust without Lender's prior written consent.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note unless payment of interest at that rate would be contrary to applicable law, in which event such expenses shall bear interest at the highest rate permitted by applicable law from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of any Grantor, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Alaska Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate unless payment of interest at that rate would be contrary to applicable law, in which event such expenses shall bear interest at the highest rate permitted by applicable law from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Alaska without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Alaska.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the Alaska state courts in the Judicial District at or nearest Lender's address shown herein, or at Lender's option, to the jurisdiction of the courts wherever any Property is located.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Royal T. Hill, Sr. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Royal T. Hill, Sr..

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Alaska Pacific Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by Royal T. Hill, Sr. in the principal amount of $120,000.00 dated July 20, 2110, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JULY 20, 2110.

GRANTOR:

X _____
Royal T. Hill, Sr.

LASER PRO Lending, Ver. 5.52.10.001 Copr. Harland Financial Solutions, Inc. 1997, 2010. All Rights Reserved.

Certified to be True and Correct Copy of Original

_Cynthia M. El-Khoury_
Cynthia El-Khoury-VP Loan Documentation Manager
Assigned to BIA without recourse

EXHIBIT "A"

This exhibit is attached to and is a part of each of the "Security Documents" (include without limitation, any Security Agreement, Consumer Security Agreement, UCC Financing Statement(s), and Agreement to Provide Insurance) executed in connection with that certain loan between **Alaska Pacific Bank** (Lender) and **Royal T. Hill, Sr.** (borrower or Grantor) dated **July 09, 2010.**

All of the following property now owned or hereafter acquired by borrower/grantor and wherever located.

(A) PMM ON THE VESSELS "CATHY J" (O/N 683895) & "E-Z RIDER" (O/N 626796), together with all of its equipment and appurtenances, including, but not limited to its boilers, engines, machinery, masts, spars, riggings, boats, anchors, chains, cables, tackle, apparel, furniture, fittings, equipment, refrigeration, parts, gear, fire-fighting and life saving equipment, propulsion machinery, navigation equipment, electronic equipment, auxiliary machinery, deck gear, hydraulic pumps and motors, fishing gear, fish processing equipment and all licenses and permits, whether now owned or hereafter acquired, whether on-board or not, and all renewals, additions, improvements, and replacements hereafter made in or to the vessel or any part of it or in or to such equipments and appurtenances of the vessel, all of which is hereafter referred to as the "Vessel";
(B) All charters, leases, accounts, general intangibles, chattel paper, money, documents, instruments, freights, hire, charter hire, earnings, issues, revenues, income, profits or benefits of, from, in connection with or with respect to the vessel or the operation thereof, all amounts due from underwriters under any insurance on such vessel as payment of losses or as return premiums or otherwise, all damage, salvage, condemnation or other claims or awards due or to become due in respect of any insurance on such vessel from any persons;
(C) All of the proceeds of the above-described property, including but not limited to goods, accounts, general intangibles, chattel paper, documents, instruments and money, without limitations; whether owned now or acquired later; all accessions, additions, replacements, and substitutions; all records of any kind relating to any of the foregoing; all proceeds (including insurance, general intangibles and accounts proceeds).

BY: _/s/ Royal T. Hill_____     BY: _____
Royal T. Hill, Sr.

**Alaska Pacific Bank**

BY: _/s/ John Bl_____
Loan Officer of Alaska Pacific Bank

G:\loan\processing\forms\attachment to pmm.doc

Case 3:19-cv-00280-SLG   Document 1-2   Filed 10/28/19   Page 5 of 5   EXHIBIT 2
Page 5 of 5

IA Form ALD10  
Revised January 2016

OMB Control No. 1076-0020  
Expires: 1/31/2019

# ASSIGNMENT OF LOAN DOCUMENTS AND RELATED RIGHTS

Alaska Pacific Bank/Northrim Bank ("Lender") hereby assigns to the Department of the Interior ("Department") all rights the Lender has under the loan documents identified on the attached **Exhibit A**. The Lender makes this Assignment under the terms of the Department's Loan Guarantee, Insurance and Interest Subsidy Program, 25 U.S.C. §§ 1481 *et seq.*, 1511 *et seq.*, and 25 CFR Part 103 (the "Program"), upon final payment from the Department for the Lender's Claim for Loss under the following instrument(s):

☑ Department Loan Guarantee Certificate Number G103D1E0504  
☐ Department Loan Insurance Agreement Number _____, with respect to the loan identified in **Exhibit A**.

The persons signing below represent to the Department that they have due authorization and power to sign this Assignment in the capacity stated and to bind the Lender. The Lender also represents to the Department that immediately prior to making this Assignment, it was the sole owner of the Lender's interest in the documents and rights assigned hereby, or the duly authorized agent of all such parties.

This Assignment is binding on the Lender, as well as its officers, directors, employees, agents, heirs, executors, administrators, assigns, successors in interest, predecessors in interest, and anyone else claiming by, through or under the Lender. In the event any claim, demand, or action is brought or pursued by, through, or under the Lender in contradiction of this Assignment, the Lender agrees to indemnify the Department and hold it harmless with respect to the claim, demand or action.

Lender: Northrim Bank  
By: Mildred Sy  
Its: Vice President, Credit Officer

Paperwork Reduction Act Statement: This form is covered by the Paperwork Reduction Act. It is used to transfer certain rights from the respondent to the Federal government. The information is provided by respondents to obtain or retain a benefit. In compliance with the Paperwork Reduction Act of 1995, as amended, the collection has been reviewed by the Office of Management and Budget and assigned a number and an expiration date. The number and expiration date are at the top right corner of the form. An agency may not sponsor or conduct, and a person is not required to respond to, a request for information collection unless it displays a currently valid OMB Control Number. The public reporting burden is estimated to average *1 hour per respondent*. This includes the time needed to understand the requirements, gather the information, complete the form, and submit it to the Department. Comments regarding the burden or other aspects of the form may be directed to the Indian Affairs Information Collection Clearance Officer, Office of Regulatory Affairs – Indian Affairs, 1849 C Street, NW, MS-4141, Washington, DC 20240.

IA Form ALD10  
Revised January 2016

OMB Control No. 1076-0020  
Expires: 1/31/20019

# Exhibit A
# Loan Documents

The following loan documents are all subject to the Assignment of Loan Documents and Related Rights, to which this Exhibit is attached. Except as otherwise noted, the loan documents are all dated <u>July, 20</u>, 20<u>10</u>:

☑ Note from Lender to <u>Royal T. Hill, Sr. DBA: Royal Charters & Tours</u> ("Borrower") in the original principal amount of $<u>120,000.00</u>.

☑ Preferred Marine Mortgage from Borrower to Lender, recorded on <u>August 19</u>, 20<u>10</u> at Batch <u>761856</u>, Doc ID <u>12472509</u> in the First Judicial District, State of Alaska.

X    Security Agreement from Borrower to Lender.

☑ Financing statement from Borrower to Lender, recorded on <u>August 4</u>, 20<u>10</u> at Book <u>2010</u>, Page <u>701296</u> in the <u>State of Alaska's</u> (Recorder's Office).

☐ Guarantee from _____ ("Guarantor") to Lender.

☑ Other (specify) <u>Financing statement continuation recorded on March 18, 2015 at book 2015, page 004197-2 in the State of Alaska's Recorder's Office</u>.

☑ Other (specify) <u>Disbursement Request and Authorization in the amount of $120,000.00 dated 07/20/2010. Disbursement Request and Authorization in the amount of $115,435.85 dated 03/31/2011. Disbursement Request and Authorization in the amount of $107,934.60 dated 03/16/2012</u>.

☑ Other (specify) <u>Change in Terms Agreement in the amount of $115,435.85 dated 03/31/2011. Change in Terms Agreement in the amount of $107,934.60 dated 03/16/2012</u>.

☐ Other (specify) <u>Agreement to Provide Insurance for the collateral securing the loan in the amount of $120,000.00 dated 07/20/2010</u>

☐ Other (specify) <u>Confession of Judgment Without Action dated 4-1-18</u>



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

April 17, 2019

Royal T. Hill Sr.
512 Lumbago Dr.
Hoonah, AK. 99829

Re: Royal T. Hill Sr. dba Royal Charters & Tours
Loan Guarantee # A103D1E0504
Balance due $75,513.28

Dear Mr. Hill:

***IMPORTANT***

FOR A DESCRIPTION OF YOUR RIGHTS SEE THE ENCLOSED NOTICE OF RIGHTS

The purpose of this letter is to demand payment for Loan Guarantee A103D1E0504. On or about April 2, 2019 the Division of Capital Investment paid a claim for loss to Northrim Bank. As a result, this debt is now owed to the United States Government. The Promissory Note provides for acceleration of the entire indebtedness on the event of default. The balance is now due.

Demand is made upon you for full payment of the following amount:

| | | |
|---|---|---|
| Principal | $ 68,694.71 | |
| Interest | $ 6,818.57 | as of April 17, 2019 |
| Late fees | $     00.00 | |

Total due $ 75,513.28    as of April 17, 2019

Interest is accruing at a daily rate of 0.01918%

Payment may be made by cashier's check made payable to the Bureau of Indian Affairs and sent to the following address:

Bureau of Indian Affairs
Attn: Loan Accounting Section
1001 Indian School Road, Suite 350
Albuquerque, New Mexico 87104
Reference Loan# A103D1E0504

Payment may also be made electronically at https://www.pay.gov/public/form/start/76177312. Please include your loan number to ensure proper credit.

If you are remitting payment via mail or through our Web Portal, please call or email me with the tracking number from the delivery company or a copy of the pay.gov confirmation.

To dispute the validity of this debt or any portion thereof, you must notify this office in writing within **30 days** after receiving this notice. Please include any documents to support your dispute. Upon request, this office will provide you with a copy of the loan documents.

If you do not dispute this debt or remit payment for the total amount due of $ 75,513.28 within 30 days of receipt of this notice, collection activity will continue.

If you have any questions or want to make payment arrangements, please call or email me at the information provided below.

Sincerely,

Sherrie A. Miller, Collections Coordinator
Division of Capital Investment
Office of Indian Energy & Economic Development
1849 C Street N.W. Room 4136
Washington, D.C. 20245
202-208-3658 (Office)
202-208-4564 (Fax)
sherrie.miller@bia.gov

This is an attempt to collect a debt. Any information obtained will be used for that purpose.

# "NOTICE OF RIGHTS"

1. **Enforced Collections.** You are notified that we may refer your debt to the Department of Justice for enforced collections. You have the following rights:

    - You may inspect and copy DOI records related to the debt.
    - You may request a review of the DOI's determination that you owe a debt, or request a waiver of the debt if waiver is provided for by law.
    - You may be entitled to an oral hearing if required by statue or if the DOI decides that the question of the validity of your debt cannot be resolved by review of the documentary evidence.
    - You may enter into a written agreement with DOI to pay the debt over time. You must contact Sherrie Miller, Collections Coordinator, at 202 208-3658 sherrie.miller@bia.gov to make arrangements under this paragraph within thirty (30) days from the date of this letter.

2. **Administrative Offset.** You are notified that we may refer your debt to the Department of Treasury. If you receive a payment that may be legally offset, we intend to collect your debt by administrative offset. You have the following rights:

    - You may inspect and copy DOI records related to the debt.
    - You may request a review of the DOI's determination that you owe a debt, or request a waiver of the debt if waiver is provided for by law.
    - You may be entitled to an oral hearing if required by statue or if the DOI decides that the question of the validity of your debt cannot be resolved by review of the documentary evidence.
    - You may enter into a written agreement with the DOI to pay the debt over time. You must contact Sherrie Miller, Collections Coordinator, at 202 208-3658 sherrie.miller@bia.gov to make arrangements under this paragraph within thirty (30) days from the date of this letter.

    NOTE: You will be separately notified of the rights available to you if we intent to offset the following types of Federal payments: salary, retirement, income tax refund and certain benefits.

3. **Credit Bureau Reporting.** You are notified that we may report your debt to national credit bureaus. The information to be disclosed to commercial/consumer reporting agencies will

include your name, address, and tax payer identification number; the amount, status, and history of your debt, and the name of the agency or program under which the debt arose.

You have the following rights with respect to debts to be reported to commercial/consumer reporting agencies:

- You may conduct a complete examination of your debt.
- You may dispute information in the records of the DOI about your debt.
- You may request administrative repeal or review of the debt, unless all administrative appeals have been exhausted.
- You may be entitled to an oral hearing if required by statue or if the DOI determines that the question of validity of your debt cannot be resolved by review of the documentary evidence.

You must contact Sherrie Miller, Collections Coordinator, at 202 208-3658 sherrie.miller@bia.gov within sixty (60) days from the date of this letter to make arrangements under this paragraph.

NOTE: These rights do not apply to debts already reported to commercial/consumer reporting agencies.



United States Department of the Interior
OFFICE OF THE SECRETARY
Washington, DC 20240

CERTIFICATE OF INDEBTEDNESS

Debtor Name and
Address:

Royal T. Hill dba Royal Charters & Tours
P. O. Box 67
Hoonah, AK. 99829-0067

**Total debt due United States as of July 22, 2019:**
  **Principal: $ 68,694.71**
**Interest (through July 22, 2019\*):  $ 8,083.31**
  Total: $ 76,778.02

\*As per the Promissory Note executed on July 20, 2010

I certify that the Department of the Interior, Office of Indian Energy and Economic Development (OIEED), Division of Capital Investment (DCI), and the Bureau of Indian Affair's (BIA) Loan Accounting Section (LAS) record shows that the debtors named above are indebted to the United States in the amount stated above.

The claim arose from a defaulted Guaranteed Loan pursuant to 25 CFR Part 103.

**CERTIFICATION:** Pursuant to 25 USC § 1746(2), I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief based upon information provided by the Department of the Interior, Office of Indian Energy and Economic Development (OIEED), Division of Capital Investment (DCI), and the Bureau of Indian Affair's (BIA) Loan Accounting Section (LAS).

Date: 7/22/2019

Sherrie A. Miller
Collections Coordinator
Division of Capital Investment
Office of Indian Energy and Economic Development
U. S. Department of the Interior